IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEFFREY J. HYSLIP, on behalf of himself and all other similarly situated,<br><br>                          Plaintiff,<br><br>          vs.<br><br>JOHN J. RIGAS, MICHAEL J. RIGAS, TIMOTHY J. RIGAS, and JAMES P. RIGAS,<br><br>                          Defendants. | CIVIL ACTION NO.<br><br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS<br><br>JULY TRIAL DEMANDED |

## NATURE OF THE ACTION

Plaintiff, individually and on behalf of all other similarly situated, by and through their

attorneys, allege the following on information and belief, except as to allegations concerning his

own actions, based upon an investigation made by and through his counsel.

1.      This is a securities fraud class action brought on behalf of all purchasers of the

securities of Adelphia Business Solutions, Inc. ("Adelphia Solutions" or the "Company")

between January 6, 2000 and March 27, 2002, inclusive, (the "Class Period"), for violations of

the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Adelphia Solutions is a Delaware corporation with offices located at One North

Main Street, Coudersport, Pennsylvania.  Prior to January 11, 2001, the Company was a majority

(79%) owned subsidiary of Adelphia Communications Corp.  ("Adelphia").  On January 11,

2002, Adelphia distributed all of its shares of Adelphia Solutions stock to the shareholders of

Adelphia Solutions. As a result, the Rigas Defendants collectively obtained a direct majority

ownership Adelphia Solutions.

3.      On March 27, 2002, Adelphia Solutions filed for Chapter 11 Bankruptcy and thus

cannot be named as a defendant.  Adelphia Solutions provides integrated telecommunications

270876

services to businesses, governmental and educational customers.  Adelphia Solutions provides

local phone, long distance, high speed data transmission and Internet connectively services.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§1331 and 1337 and §27 of the Exchange Act (15 U.S.C. §78aa).

5.      This action arises under §10(b) and §20(a) of the Exchange Act (15 U.S.C.

§78j(b) and §78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

6.      Venue is proper in this district pursuant to ¶27 of the Exchange Act (15 U.S.C.

§78aa) and 28 U.S.C. §1391 (b) and (c).  Substantial acts in furtherance of the alleged fraud

and/or its effects have occurred within this district and Defendants conduct substantial business

in this District.

7.      In connection with the acts and omissions alleged in this Complaint, Defendants,

directly or indirectly, used the means and instrumentalities of interstate commerce, including,

but not limited to, the mails, interstate telephone communications and the facilities of the

national securities markets.

## PARTIES

8.      Plaintiff Jeffrey J. Hyslip purchased Adelphia Solutions securities during the

Class Period as set forth in the accompanying Certification which is incorporated herein by

reference, and was damaged thereby.

9.      The Defendants (or, collectively, the "Rigases"), at all times relevant to this

action, are believed to have served in the capacities listed below and received substantial

compensation;

(a)      Defendant John Rigas is Chairman of the Board of Directors of Adelphia

Solutions.  John Rigas is also the founder, Chairman of the Board, President and Chief Executive

2

270876

Officer of Adelphia.  John Rigas owns or controls over 74% of the Class B common stock of Adelphia.  As of April 1, 2001, John Rigas owned or controlled approximately 649,500 shares of Adelphia Solutions Class A common stock.  John Rigas is the father of Defendants Michael J. Rigas, Timothy J. Rigas and James P. Rigas.

(b)    Defendant Michael J. Rigas is Vice Chairman, Securities and a Director of Adelphia Solutions.  Michael Rigas also served as Executive Vice President, Operations and a Director of Adelphia.  As of April 1, 2001, Michael J. Rigas owned or controlled approximately 53.7% shares of the outstanding Class B common stock of Adelphia and 602,500 shares of Class A common stock of Adelphia Solutions.

10.    Timothy J. Rigas is Vice Chairman, Chief Financial Officer, Treasurer and a Director of Adelphia Solutions.  Timothy J. Rigas was also Executive Vice President, chief Financial Officer, Chief Accounting Officer and Treasurer of Adelphia.  As of April 1, 2001, Timothy J. Rigas owned or controlled more than 53% of the outstanding Class B common stock of Adelphia and 592,500 shares of Class A common stock of Adelphia Solutions.

11.    James P. Rigas is Vice Chairman, Chief Executive Officer, President and a Director of Adelphia, Solutions.  James Rigas also served as Executive Vice President, Strategis Planning of Adelphia.  As of April 1, 2001, James P. Rigas owned or controlled more than 49% of the outstanding Class B common stock of Adelphia and 642,500 shares of the Class A common stock of Adelphia Solutions.

12.    The Defendants were the senior officers and/or directors of Adelphia Solutions. Defendants were also controlling stockholders of Adelphia Solutions whether by their majority ownership interest in Adelphia prior to the distribution of Adelphia's ownership interest in Adelphia Solutions or as majority stockholders of Adelphia Solutions after the distributions of

270876

Adelphia's interest.  Thus, Defendants were controlling persons of the Company.  In addition, the Defendants had the power and influence, and exercised such power and influence, to cause Adelphia Solutions to engage in the unlawful practices complaint of herein.  Because of their executive, managerial and/or directorial positions with Adelphia Solutions and Adelphia, the Defendants had access to the adverse, non-public information about the business, finances, strategy and future business prospects of Adelphia Solutions as particularized herein and acted to misrepresent, misstate or conceal such information from plaintiff, class members (as described herein), and the investing public.

13.    The Defendants participated in the wrongdoing complained of herein in order to, among other things:

(a)    Inflate and maintain the price of the securities of the Company and of Adelphia;

(b)    Protect and enhance their position as officers and/or directors of Adelphia and Adelphia Solutions and the substantial compensation and prestige they obtained thereby;

(c)    Enhance the value of their personal holdings of Adelphia and Adelphia Solutions securities and permit them to purchase additional common stock and maintain adequate margin levels; and

(d)    Misstate Adelphia Solutions' assets, revenues and earnings in order to inflate the price of Adelphia Solutions and Adelphia securities.

14.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated and continues to operate as a fraud or deceit on purchasers of Adelphia Solutions securities, by disseminating materially false and misleading statements and/or concealing material adverse facts.  The ongoing scheme: (a) deceived the investing public

4

regarding the business, finances and value of Adelphia Solutions' assets and securities; and (b) caused plaintiff and other members of the Class (defined in ¶15) to purchase Adelphia Solutions securities at artificially inflated prices.

15.     Each of the Defendants knew of and recklessly disregarded the fact that the illegal acts and practices and misleading statements and omissions described herein would adversely affect the integrity of the market for Adelphia Solutions securities and would artificially inflate or maintain the price of those securities.  Each of the Defendants, by acting as herein described, did so knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiffs and members of the Class plaintiffs seek to represent.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons who purchased or other wise acquired Adelphia Solutions securities between January 6, 2000 and March 27, 2002, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of each of the immediate families, any subsidiary or affiliate of Adelphia or Adelphia Solutions and the directors and officers of Adelphia or Adelphia Solutions or their subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

17.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members of the Class located throughout the United States.  As of November 9, 2001, there were outstanding approximately 47.7 million shares of Adelphia Solutions Class A common stock and approximately 86.7 million shares of Adelphia Class B common stock.

270876

Throughout the Class Period, Adelphia securities were actively traded on the national securities exchanges. Record owners and other members of the Class may be identified from reco5rds maintained by Adelphia Solutions and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

18.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

19.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

20.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)     whether Defendants participated in the pursued the common course of conduct complained of herein;

(c)     whether documents, press releases, SEC filings and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, financial condition, assets and prospects of Adelphia Solutions;

6

(d)    whether statements made by Defendants to the investing public during the class Period misrepresented and/or omitted to disclose material facts about the business, finances, performance and prospects of Adelphia Solutions;

(e)    whether the market price of Adelphia Solutions securities during the Class Period was artificially inflated due to the material misrepresentations and omissions of material facts complaint of herein; and

(f)    to what extent the members of the Class have sustained damages and the proper measure of damages.

21.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

**SUBSTANTIVE ALLEGATIONS**

**A.    Artificial Inflation of Line Counts**

22.    Defendants portrayed Adelphia Solutions, during the Class Period, as a growing telecommunications business.  Among the key indicators of its growth that the market looked to was the number of new customers that Adelphia Solutions assigned to its available telecommunications lines in its various regions of service.  There "line counts" were important statistics reflecting the new business and growth of the company.  Likewise, the amount of customers who retained their lines (did not terminate/disconnect service) was significant in arriving at a net (new liens less lines disconnected) line count for Adelphia Solutions.

23.    The Defendants sought to emphasize the growth that Adelphia Solutions was experiencing by publicly reporting Adelphia Solutions' line count statistics.  However, Defendants knew or were deliberately reckless in disregarding that the levels of line counts for Adelphia Solutions which they reported publicly were grossly overstated because of the following widespread practices put into place by or condoned by Defendants at Adelphia Solutions:

(a)    Adding hundreds of lines to existing customers who never ordered them and disconnecting the lines within the same month without, however, reporting the disconnect/termination.  This practice, also known as "cramming," artificially inflated Adelphia Solutions' reporting line counts.  Customers were not aware of the additional lines in most cases because the services were terminated in the same month and they were never billed.  Thus, there were artificially inflated lines counts on the books of Adelphia Solutions.

(b)    The names of businesses were entered into the system as "new customers" even though the businesses had never signed up for service with Adelphia Solutions.  Adelphia Solutions would then either disconnect the lines in the same month without reporting the disconnection or simply throw away the bills.  This practice, also known as "slamming," added to the artificial inflation of the line counts that Defendants publicly reported.

(c)    Businesses with bad credit histories with other telecommunications companies or with Adelphia Solutions were entered as "new lines" when the businesses had not ordered new service or were known to be unable to pay for new services.

(d)    Adelphia Solutions customers who had disconnected all or a portion of their lines were still being retained on Adelphia Solutions systems and being billed for the disconnected lines.  Again, bills for the disconnected lines were destroyed.

8

24.     While there practices were prevalent throughout Adelphia Solutions, its Louisville and Philadelphia offices were noteworthy for the level of line count inflation sustained. Indicative of the level of line count inflation that was occurring, in approximately April 2001, the Philadelphia office received a legitimate large line order that it could not fill because the system reported an insufficient number of lines/ports available to fill the order. However, many of those lines were actually being improperly reported as active because of the foregoing practices to deceptively inflate Adelphia Solutions' line counts.

25.     The Defendants encouraged the improper sales and accounting practices described above. At least as early as November, 2000, personnel in Adelphia's West Seneca, New York Data Center, the operations unit responsible for billing Adelphia Solutions customers, notified corporate accounting department employees and top Adelphia Solutions' executives that the line counts being reported to the public by multiple cities were grossly overstated and inaccurate and had been so for many months. The Data Center personnel were told by the executives to not speak about the issue to anyone and that the Adelphia Solutions Senior Leadership Team would take care of this issue quietly by themselves.

### Defendants' False and Misleading Statements Regarding Line Counts

26.     On January 6, 2000, Defendants caused Adelphia Solutions to issue a press release announcing the Company's estimate that it:

> Sold approximately 87,570 new access lines and installed approximately 80,200 new access lines during the fourth quarter ended December 31, 1999. For the year ended December 31, 1999, the Company estimates that it has sold approximately 221,000 new access lines. As of December 31, 1999, the Company estimates that its has a total of approximately 331,000 access lines installed, of which approximately 55% were provisioned on its own network (on-switch).

270876

27.    In each of Adelphia Solutions' quarterly reports on Form 10-Q during the Class Period the Defendants continue to cause Adelphia Solutions to report false and misleading lines counts as follows:

| New Lines Sold | New Lines Installed | Time Period | Source (date) |
|---|---|---|---|
| 87,570 | 80,202 | Qtr end 12/31/99 | 10- K(3/30/00) |
| 72,572 | 81,165 | Qtr end 3/31/00 | Press Release (5/9/00) |
| 72,268 | 81,460 | Qtr end 6/30/00 | Press Release (8/9/00) |
| 103,139 | 83,225 | Qtr end 9/30/00 | Press Release (11/9/00) |

28.    At year end 2000, Defendants were forced to begin addressing some of the accounting problems created by their false and deceptive sales and line count practices. Specifically, for the quarter ending December 31, 2000, Defendants caused Adelphia Solutions to take a charge of $15 million for "potentially uncollectible accounts receivable associated primarily with Internet service providers." However, given the Defendants' false sales and billing practices, it is clear that this provision was an effort to begin to address the undisclosed improper sales and billing practices of the Company. No disclosure was made during the Class Period of the false sales practice or of the total effect of the sales' practices of Adelphia Solutions business. Instead, Defendants concealed that many of the "lines" connected to Adelphia Solutions' system were the result of slamming or cramming or other improper sales practices. Throughout the Class Period, Defendants failed to disclose the impact of their deceptive sales practices of Adelphia Solutions reported level of line counts and its business in general.

270876

### A.    Commitments to Adelphia Communications' Corporate Overhead

29.    Defendants caused Adelphia Solutions to enter into various agreements with Adelphia pursuant to which Adelphia Solutions would be obligated under certain circumstances to make payments to Adelphia.  In addition, Defendants obligated Adelphia Solutions to share corporate overhead services and other business expenses and services with Adelphia.  However, class members were not informed that these payments to Adelphia and sharing of corporate expenses were handled in a completely arbitrary manner at the whim of Defendants and without regard to the actual expenses incurred by Adelphia Solutions.  Rather, Defendants arbitrarily decided based on the financial needs of any one or more of the many companies under the control of the Rigases as to how to allocate expenses and payment obligations among the many Rigas-owned companies.

30.    Despite their actual personal direction of the labyrinth of companies in the Rigas empire, Defendants misleadingly caused Adelphia Solutions to represent to investors that its corporate overhead expenses were allocated with some reasonable relationship to Adelphia Solutions' actual usage of overhead services.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS
REGARDING CORPORATE OVERHEAD**

31.    For example, the proxy statement issued by Adelphia Solutions on July 7, 2000 , stated:

> During the year ended December 31, 1999, the Company made demand advances Adelphia periodically, for which the Company earned interest at 5.15%, totaling approximately $8.5 million. During the period January 1, 1999 to December 31, 1999, the largest amount due from Adelphia Communications at the end of any quarter was approximately $392.6 million at December 31, 1999.
>
> The Company and Adelphia Communications have entered into a registration rights agreements, as amended, whereby the Company

11

has agreed to provide to Adelphia Communication and certain permitted transferees, with respect to common stock owned by them, two demand registration rights per year under certain conditions, including that any such demand be with respect to shares with a minimum of $10 million in market value, and with certain piggyback registration rights in future public offerings of the common stock. Adelphia Communications' demand registration rights terminate at such time as Adelphia Communications creases to hold at least $10 million in market value of common stock.

During the year ended December 31, 1999, the Company incurred charges from Adelphia Communications of approximately $8.6 million for the provision to the Company to shared corporate overhead services in areas such as personnel payroll, management information services, computer services, shared use of office, aircraft and network facilities and support equipment. The Company expects that shares for the provision of similar services by Adelphia Communications to the Company, or by the Company to Adelphia Communications will continue to be incurred or charged by these services have been based on allocation of Adelphia Communications' incremental costs incurred for these services, and do not necessarily represent the actual costs that would be incurred if the Company was to secure such services on its own or the Management Services Agreement between the Company and Adelphia Communications dated April 10, 1998, with respect to shared corporate overhead service. During the year ended December 31, 1999, the Company (i) paid Adelphia Communications or certain of Adelphia Communications' affiliates, fiber lease payments of approximately $0.2 million, (ii) received from Adelphia Communications $1.8 million in revenue for providing switched services, and (iii) paid to entities owned by members of the Rigas family who are executive officers of the Company approximately $1.6 million for property, plaint and equipment and services

32.    Defendants falsely and misleadingly referred to the overhead expenses in

Adelphia Solutions other public filings as "corporate overhead." The levels of "corporate

overhead" reported by Defendants in Adelphia's public filings were as follows:

| **Corp. Overhead** | **Source** |
| --- | --- |
| $15.9 million | 10-Q (05/15/00) |
| $14.1 million | 10-Q (08/14/00) |
| $17.1 million | 10-Q (04/02/01) |

270876

| $23.7 million | 10-Q (04/02/01) |
| $17.2 million | 10-Q (08/14/01) |
| $14.4 million | 10-Q (08/14/01) |
| $14.8 million | 10-Q (11/13/01) |

33.     The proxy statement and Adelphia Solutions' other public filings identified in ¶32 herein were false and misleading in that they violated generally accepted accounting practices ("GAAP").  Adelphia Solutions did not properly account for its corporate overhead expenses it paid to Adelphia .  Among other things, Adelphia Solutions engaged in the following practices:

(a)     Adelphia Solutions and Adelphia failed to properly document labor, operating, equipment, circuit network and other costs to the appropriate legal entities.  Where employees worked in part for Adelphia Solutions, their time was not fully or accurately charged/recorded to Adelphia Solutions;

(b)     Software applications licensed from Remedy, Microsoft Veritas and Oracle have been provided by Adelphia to Adelphia Solutions with no or inadequate accounting and licensing documentation, including proper notice to the manufacturer;

(c)     Hardware and network circuits have been used and routed to Adelphia Solutions from Adelphia or other entities with no or inadequate accounting documentation;

(d)     Office space (rooms, etc.) were utilized by Adelphia Solutions in Coudersport, Pennsylvania in buildings or spaces shared with Adelphia without any or with inadequate documentation and accounting; and

(e)     Powerlink network sales, support, accounting and provisioning services were shared with Adelphia Communications with no or inadequate accounting documentation.

270876

**A.    Adelphia's Off-balance Sheet Liabilities**

34.    Throughout the Class Period, Adelphia's debt was understated because the Rigases omitted material off-balance sheet liabilities for which they and Adelphia were co-liable. The Rigases and Adelphia had entered into agreements with entities controlled by the Rigases pursuant to which Adelphia guaranteed certain loans, in excess of $2 billion.  Adelphia Solutions, because of its heavy dependence on the Rigases and Adelphia was materially impacted by these off-balance sheet liabilities and they should have been publicly disclosed to Adelphia Solutions investors.

**Defendants' False and Misleading Statements
Regarding Off-Balance Sheet Liabilities**

35.    Defendants' public statements did not disclose the off-balance sheet liabilities. For example, in Adelphia Solutions' proxy statement, disseminated July 6, 2001, Defendants caused Adelphia Solutions to state:

> The Company and certain of Adelphia Communications' other subsidiaries and affiliates are parties to a joint bank credit facility. As part of this facility, the Company and its subsidiaries have the ability to borrow up to an aggregate of $500.0 million which, if borrowed, would be guaranteed by other members of the borrowing group.  As of December 31, 2000, a subsidiary of the Company had borrowed $500.0 million under this credit facility. In addition, the Company has agreed to pay a subsidiary of Adelphia $15.0 million as a fee for placing the credit facility.  The interest rate at which the Company has borrowed these funds is 12 ½%, a portion of which is payable to a subsidiary of Adelphia.  For the year ended December 31, 2000, the Company recorded $21.9 million for interest expense relating to the credit facility, $7.0 million of which was payable to a subsidiary of Adelphia.

Given this heavy dependence on Adelphia the off-balance sheet liabilities of Adelphia were material to the ability of Adelphia Solutions to maintain its sources of financing.

14

36.    The proxy statement and Defendants 10-Q's and 10-K's filed during the Class Period identified in ¶ 32 herein were false and misleading and violated GAAP because they failed to disclosed the off-balance sheet liabilities of Adelphia and their impact on Adelphia Solutions.

**The Truth Emerges**

37.    On March 1, 2002, Adelphia Solutions announced that it would not make an interest payment of $15.3 million on certain secured notes of the Company and that it, therefore, would be in default of the notes.

38.    On March 27, 2002, Adelphia announced its results for the fourth quarter for the year ended December 31, 2001.  In the press release, the footnote disclosures for the financial statements noted the following:

> Certain subsidiaries of the Company are co-borrowers with certain companies owned by the Rigas family and managed by the Company ("Managed Entities") for borrowing amounts of up to $5,630,000[,000].  Each of the co-borrowers is liable for all borrowing under the credit facilities.  Amounts borrowed under these facilities by the Company's subsidiaries are included as debt in the Company's consolidated balance sheet.  Amounts borrowed by Managed Entities under the facilities are not included on the Company's consolidated balance sheet…As of December 31, 2001, co-borrowing credit facilities balances, net of amount otherwise reflected as debt on the Company's consolidated balance sheet, totaled approximately $2,284,000[,000].

39.    In a conference call following the announcement of financial results, Adelphia announced that it had entered into these off-balance sheet financing arrangements which obligated Adelphia for approximately $2.3 billion in debts, together with an entity controlled by the Rigas family.

40.    That entity, Highland Holdings (the "Partnership"), was a closely held partnership controlled by the Rigases which had borrowed money against the credit facilities.  It was further

disclosed that Highland Holdings did not have sufficient assets to cover the debts which would

obligate Adelphia to pay any outstanding amounts. The $2.3 billion amount was eventually

raised to $2.7 million as Adelphia made further disclosures about its liabilities. In addition, it

was eventually disclosed that half of the Rigases $650 million Adelphia stake was pledged

against margin.

     41.    On the same day, March 27, Adelphia Solutions announced that it had filed for

Chapter 11 Bankruptcy protection.

     42.    On May 2, 2002, Adelphia further disclosed that it would likely restate

Adelphia's borrowings in its financial statements to increase them by $1.6 billion, as of

December 31, 2001; $1.2 billion as of December 31, 2000; and $700 million as of December 31,

1999.

### DEFENDANTS' RESPONSIBILITY FOR INTERNAL CONTROLS AND FOR FINANCIAL REPORTING

     43.    Defendants had the responsibility to maintain sufficient controls to accurately

report Adelphia Solutions' results. The representations made by a company in its financial

statements and in other financial disclosures to the public are the representations of the

company's management.

     44.    According to SEC rules, to accomplish the objectives of accurately recording,

processing, summarizing and reporting financial data, a company must establish an internal

control structure. Pursuant to § 13(b)(2) of the Exchange Act, Adelphia Solutions was required

to:

> [M]ake and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
>     (A)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that

> (1) – transactions are executed in accordance with management's general or specific authorization;
>
> (ii) transactions are recorded as necessary
>
> (I) to permit preparation of financial statements in conformity with generally accepted accounting principles…

45.     To accomplish the objectives of accurately recording, processing, summarizing and reporting data, a company mush establish an internal control structure.  In the structure, according to Appendix D to Statement on Auditing Standards No. 55, <u>Consideration of the Internal Control Structure in a Financial Statement Audit</u> ("SAS 55"), management should consider, among other things, such objectives as (i) making certain that "[transactions are recorded as necessary … to permit presentation of financial statements in conformity with generally accepted accounting principles … and to maintain accountability for assets," and (ii) making certain that "[the recorded accountability for assets is compared with the existing assets as reasonable intervals and appropriate action is taken with respect to any differences."

46.     According to SAS 55:

> Establishing and maintaining an internal control structure is an important management responsibility.  To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and this it is modified as appropriate for changes in conditions.

AU § 319A.13.

47.     Adelphia Solutions had repeatedly represented to investors and adequacy and strength of its internal control systems.  However, Adelphia Solutions' lack of internal controls and procedures were deficient in having the process or procedures to review and approve related party transactions including its overhead expenses.

48.     Contrary to the requirements of GAAP and SEC rules, Adelphia Solutions failed to implement and maintain an adequate internal accounting control system.  Defendants acting as Adelphia Solutions' management knowingly tolerated the existence of inadequate internal controls and/or recklessly disregarded its obligation to implement adequate controls to ensure that overhead expenses and revenues were properly recorded in compliance with GAAP.

49.     Further, the undisclosed adverse information concealed by Defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges, and customary business practice, is expected by investors and securities analysts to be disclosed and it known by corporate Officials and their legal and financial advisors to be the type of information that is expected to be and must be disclosed.

## FRAUD ON THE MARKET DOCTRINE

50.     The market for Adelphia Solutions securities was open, well-developed and efficient at all relevant times.  As a result of the Defendants' materially false and misleading statements and failure to disclose, Adelphia solutions securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Adelphia Solutions securities relying upon the integrity of the market price of Adelphia Solutions securities and market information relating to Adelphia Solutions and have been damaged thereby.

51.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Adelphia Solutions securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  These statements and omissions were materially false and misleading in that they failed to disclose material information and

270876

misrepresented the truth about the Company, its business, finances and operations, as further set forth above.

52.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were substantial contributing causes of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made materially false or misleading statements about Adelphia Solutions' business, finances and operations.  These material misstatements and omissions have the cause and effect of creating in the market an unrealistically positive assessment of Adelphia and its business, finances and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at an artificially inflated price, thus causing the damages complained of herein.

53.    At all relevant times, the market for Adelphia Solutions securities was an efficient market for the following reasons, among others:

(a)    Adelphia Solutions securities met the requirements for listing, and was listed and actively traded on the NASDAQ, an efficient market;

(b)    As a regulated issuer, Adelphia Solutions filed periodic public reports with the SEC;

(c)    Adelphia Solutions regularly issued press releases which were carried by national news wires;

19

(d)     Throughout the Class Period, Defendants actively solicited press coverage and attention from securities brokerage firms and distributed, or caused to be distributed, information and reports to shareholders, securities firms, analysts and customers; and

(e)     Throughout the Class Period, it is believed that Defendants met with representatives of securities firms, investors and potential investors, including shareholders, and continuously disseminated false statements about the strength and potential of Adelphia Solutions' business, which statements were relied upon by the investing public.

54.     As planned, Defendants' positive statements and false financial statements and false projections of their expected financial performance continued to support and increased the price of the Company's securities.

55.     As a result, the market for Adelphia Solutions securities promptly digested ongoing information with respect to Adelphia from all available sources and reflected such information in Adelphia's securities prices.  The analysts and securities firms with whom Defendants met also provided such information about Adelphia Solutions into the markets. Under these circumstances, all purchasers of Adelphia Solutions securities during the Class Period suffered similar injury due to their purchase of securities at artificially inflated prices and a presumption of reliance applies.

270876

**SCIENTER ALLEGATIONS**

56.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public statements, issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance of dissemination of such statements or documents as primary violators of the federal securities laws.  As set forth elsewhere herein, Defendants, by virtue of their receipt of information reflecting the true facts regarding Adelphia Solutions, Adelphia, and their business practices, their control over and/or receipt of Adelphia Solutions' and Adelphia's allegedly materially misleading misstatement and/or their associations with the Company and Adelphia which made them privy to confidential or proprietary information concerning Adelphia Solutions and Adelphia were active and culpable participants in the fraudulent scheme alleged herein.  Defendants were the senior executives and directors of Adelphia Solutions and Adelphia and knew of their actions in running Adelphia and Adelphia Solutions for their own personal benefit.  The false and misleading nature of the material facts alleged herein which Defendants caused to be disseminated to the investing public, personally benefited Defendants.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated without the knowledge and complicity of Defendants.

57.    The Defendants engaged in a scheme to inflate the price of Adelphia Solutions securities in order to: (a) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; (b) enhance the value of their substantial personal holdings of Adelphia; and (c) prevent the public from learning of their improper acts concerning the operations of Adelphia and Adelphia Solutions for their own personal benefit.

270876

## FIRST CLAIM FOR RELIEF

### (Violations of Section 10(b) Of The Exchange Act And
### Rule 10b-5 Promulgated Thereunder Against All Defendants)

58.    Plaintiff repeats and re-alleges the allegations set forth in ¶¶ 1-57 above.  This Claim is asserted against all Defendants.

59.    Each of the Defendants:  (a) knew or recklessly disregarded material adverse non-public information about Adelphia Solutions' financial condition, assets, results and related party transactions; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representations of and about Adelphia Solutions' business and finances.

60.    During the Class period, Defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified herein, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to made the statements made, in light of the circumstances under which they were made, not misleading.

61.    Defendants violated § 10(b) of the Exchange Act and rule 10b-5 promulgated thereunder in that they:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and of course of business that operated as a fraud or deceit upon the purchasers of Adelphia Solutions securities during the Class Period.

62.    Plaintiff and the Class have suffered damage in that, in reliance on the integrity of the market, they paid artificially inflated prices for Adelphia Solutions securities.  Plaintiff and the Class would not have purchased Adelphia Solutions securities at the prices they paid, or at

270876

all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

**WHEREFORE,** plaintiff prays for relief and judgment, as follows:

(i)      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and his counsel as Lead Counsel;

(ii)     Awarding compensatory damages in favor of plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(iii)    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(iv)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  June 14, 2002

Respectfully submitted:

**SCHIFFRIN & BARROWAY, LLP**

By:_____

Marc A. Topaz, Esquire (#63782)

23

270876

Darren J. Check, Esquire (#86279)
Three Bala Plaza East, Suite 400
Bala Cynwyd, Pennsylvania 19004
(610) 667-7706


**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
Lawrence P. Kolker, Esquire
270 Madison Avenue
New York, New York 10016
(212) 545-4600


**GRESENS & GILLEN LLP**
James W. Gresens, Esquire
510 Fleet Building
12 Fountain Plaza
Buffalo, New York  14202-2292
(716) 842-1600

**Attorneys for Plaintiff**

270876